2002 WY 161

**Michael Alexander GLEASON,
Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 00–299.**

Supreme Court of Wyoming.

Oct. 24, 2002.

Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and Richard Manning, Jr., Intern, Representing Appellee.

* Chief Justice at time of oral argument.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] On November 4, 1999, Michael Alexander Gleason (Gleason) was charged with two counts of taking indecent liberties with a minor. A jury found him guilty of both counts and he was sentenced to concurrent terms of imprisonment for five to ten years. In this appeal, Gleason alleges that the trial court erred in admitting uncharged misconduct evidence, that prosecutorial misconduct occurred, and that he received ineffective assistance of counsel.

[¶ 2] We affirm.

## ISSUES

1. Was it error to admit evidence of various uncharged acts of sexual misconduct by Gleason with minors?

2. Did the fact or manner of the prosecutor's argument in regard to the uncharged misconduct evidence constitute prosecutorial misconduct?

3. Did Gleason's trial counsel render ineffective assistance by informing the trial judge that Gleason did not wish to be present in chambers during the peremptory challenge portion of voir dire?

## FACTS

[¶ 3] On June 16, 1996, Gleason married Monica French (Monica). The two already had a daughter, A.G., who was born on November 29, 1994. Gleason had two older children from a previous marriage—a son whose name and age do not appear in the record and a daughter, whose date of birth does not appear in the record. Monica had three older children from a prior marriage—twin daughters M.F. and A.F., born October 28, 1988, and a son P.F., born November 9, 1990. M.F. was the victim of the crimes for which Gleason was convicted. Another minor female, M.W., who was born on October 1, 1983, lived with the Gleason family for a period of time in 1997–1998.

[¶ 4] The incident upon which the two criminal charges were based occurred sometime in May 1999, while the family was living with Gleason's parents in an apartment in Sundance. Because of the crowded quarters, the children slept on a foldout couch in the living room. M.F. testified that one night she was awakened by Gleason and Monica returning to the apartment. She fell back asleep, but was later awakened by Gleason, who was touching her vaginal area through her shorts. M.F. testified that she grabbed Gleason's hand and sat up, after which Gleason touched her again, this time under her clothing. M.F. got up and went into the bathroom. When she returned, Gleason was still there and he once again touched her in a similar manner.

## DISCUSSION

### UNCHARGED MISCONDUCT EVIDENCE

[¶ 5] Gleason contends that the trial court erred in admitting evidence of certain uncharged misconduct.[1] W.R.E. 404(b) governs the admissibility of uncharged misconduct evidence, which is a specialized rule within the general rule of W.R.E. 404. The entire rule reads as follows:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of Witness.—Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶ 6] Gleason had filed a pretrial demand for notice of the State's intent to offer uncharged misconduct evidence, and he had filed a motion *in limine* directed at a particular prior act. The trial court heard that motion and made some preliminary observations about relevancy, but left the matter undetermined. Subsequently, the State filed a formal response to the demand, in which it listed five witnesses, outlined their expected uncharged misconduct testimony, and identified the purposes for which the testimony was being offered. Those witnesses were M.F., A.F., P.F., M.W., and Stuart Sklut (Sklut), a Deputy Attorney General from the State of Delaware. Gleason countered with his Objections: Proposed 404(b) Evidence, in which he argued that the evidence was not relevant, that the evidence was more prejudicial than probative, and that "Rule 404(b) and Rule 403 are as all-encompassing as the Wyoming skies[.]"

[¶ 7] On May 22, 2000, the trial court entered an Order Allowing 404(b) Evidence. While once again deferring a decision as to the testimony of M.F., A.F., and P.F., the trial court did allow the uncharged misconduct testimony of M.W. and Mr. Sklut, as it had been set forth in the State's notice. Specifically, M.W. would be permitted to testify

that while she lived in Hulett that [Gleason] tried to french kiss her in front of Monica when he came home from the bar with Monica one night; about [Gleason's] verbal and physical abuse to the children; about [Gleason] telling her before her four-

---

**1.** The parties generally refer to this evidence as "404(b) evidence." We prefer the appellation "uncharged misconduct evidence." *See Howard* *v. State*, 2002 WY 40, ¶ 21 n. 2, 42 P.3d 483, 490 n. 2 (Wyo.2002).

teenth birthday that he was going to get her a little [dildo]; about [Gleason] talking about having pornographic videos; about [Gleason] taking the doorknob off their room so they could not shut the door; about [A.G.] taking off her clothes and playing with herself; and about how [Gleason] favored his biological daughter.

In its notice, the State had offered this evidence as proof of motive, intent (why Gleason was touching M.F.), knowledge (that Gleason knew what he was doing), and course of conduct. The trial court found the evidence to be relevant, as it tended to show motive, knowledge, intent, and lack of accident or mistake, and also found it to be more probative than prejudicial.

[¶ 8] Pursuant to the trial court's Order Allowing 404(b) Evidence, Mr. Sklut, the Deputy Attorney General from Delaware, would be permitted to testify as follows concerning charges that had been brought against Gleason in Delaware in 1992:

> [T]he ten criminal sexual assault charges made against [Gleason] for sexually assaulting his [oldest] daughter, [Gleason] admitting in writing that "he [Gleason] had sexual intercourse with [his oldest daughter] on at least five occasions on the dates specified in the Information ...;" that [Gleason] may have no contact with [his oldest daughter], [his oldest daughter's] mother and [his oldest daughter's] brother; and that he witnessed [Gleason] sign the admission.... He may testify about the Attorney General's probation and what it entailed and what [Gleason] did while on probation.

This evidence had been offered by the State to prove motive, intent, knowledge, and identity. The trial court found the evidence relevant to motive, knowledge, intent, and lack of accident or mistake, and found it more probative than prejudicial.

[¶ 9] Prior to voir dire on the first day of trial, the trial court held yet another hearing in chambers concerning the State's proposed uncharged misconduct evidence. The trial court reiterated its decision that the Delaware probation was admissible, but required the State to redact the documents to reflect only the five counts that had been admitted.

The admissibility of M.W.'s testimony was not reconsidered. As to M.F., A.F., and P.F., the trial court ruled that they could testify about what Gleason had done to them and to A.G. that was of a sexual nature, finding such to be relevant and more probative than prejudicial, but not about general mistreatment or physical abuse by Gleason. Once again, the specific purpose for which the testimony was allowed was to prove motive, intent, knowledge, and lack of mistake or accident.

[¶ 10] M.F. testified at trial. In addition to the incident upon which the charges were based, M.F. also testified that Gleason pinched her and A.F.'s buttocks, tickled her in the chest area, lifted up her towel after she had showered and commented that she was "getting hairier," stuck his fingers down the front of A.G.'s pants, and came into the bathroom while M.F. was naked. Gleason argues that this testimony was more prejudicial than probative, that it was not relevant, and that it had never actually been subjected to an appropriate pretrial analysis.

[¶ 11] Gleason next complains about the testimony of A.F., M.F.'s twin sister. A.F. was listed as a witness in the State's notice of uncharged misconduct evidence. The notice contained a detailed description of her proposed testimony and identified the purposes for its introduction as proof of motive, intent, plan or course of conduct, knowledge, absence of mistake, and absence of accident. The trial court's pretrial analysis of this evidence generally mirrored its analysis of M.F.'s proposed testimony.

[¶ 12] At trial, in answer to the prosecutor's question whether Gleason had ever touched her in an inappropriate manner, and in response to several follow-up questions, A.F. testified that Gleason would pinch her and M.F.'s buttocks and sometimes whistle, that he would lift up her towel and look at her backside, that he would "swipe across my chest" while they were playing, that he would enter the bathroom without knocking, that he would enter her bedroom without knocking when she was undressed, that he had put his hand down A.G.'s pants, that he told A.F. she was growing "in the upper area," that she had seen Gleason's "private areas" while he

was sitting in a chair, and that he had placed his hand on her knee and moved it closer and closer to her "private area." Gleason's objections to this testimony were overruled.

[¶ 13] M.W., another witness listed in the State's notice of uncharged misconduct evidence, also testified at trial. M.W. was thirteen and fourteen years old when she lived with the Gleason family for a period of time in 1997–1998. As mentioned earlier herein, the trial court's pretrial order permitted M.W. to testify to certain uncharged misconduct by Gleason, as outlined in the State's notice. Defense counsel objected to the testimony, but the objection was overruled. M.W. testified that Gleason had kissed her, had attempted to "french kiss" her, and had told her that he would buy her a dildo for her birthday. This testimony was part of the testimony deemed admissible by the trial court in its pretrial analysis. In its Order Allowing 404(b) Evidence, the trial court specifically concluded that the fact that Gleason had made sexual overtures to M.W. while she was of a similar age to M.F. was relevant to motive, knowledge, intent, and lack of accident or mistake, and that it was more probative than prejudicial.

[¶ 14] One more witness from the State's notice of uncharged misconduct evidence testified at trial. Mr. Sklut, the Deputy Attorney General from Delaware, identified Gleason as the person he had prosecuted in Delaware in 1992 for repeatedly having sexual intercourse with his three-year-old daughter. He also laid the foundation for admission as an exhibit of a probation document signed by Gleason admitting five such charges. Gleason's trial objections to this evidence were overruled. On appeal, Gleason contends that Mr. Sklut's testimony is "the most egregious instance of impermissible 404(b) evidence...." After suggesting that he was coerced into signing the Delaware admission in order to get out of jail, Gleason's appellate brief characterizes this evidence as "the crassest sort of irrelevant hogwash...." His argument is that proof of sexual intercourse with his three-year-old daughter does not tend to prove that, seven years later, he fondled his eleven-year-old step-daughter.

[¶ 15] Finally, Gleason argues that he was prejudiced by the testimony of the victim's maternal grandmother, Wanda McIntyre. Mrs. McIntyre testified that, during the spring and summer of 1999, M.F. appeared withdrawn and angrier than usual. Then, in mid-August of that year, M.F. had come to her and told her that Gleason was touching her inappropriately. She testified that, upon hearing this from M.F., she had called A.F. into the room, and A.F., who was even angrier than M.F., told her that Gleason was also touching her inappropriately. There was no objection at trial to this testimony.

[¶ 16] The structure of W.R.E. 404 is significant in the analysis of the admissibility of uncharged misconduct evidence. First, subsection (a) forbids use of evidence of a person's character to prove that he acted in conformity with that character at a particular time. For instance, in a prosecution for battery, the prosecutor cannot introduce evidence that the defendant has a violent temper for the purpose of proving that, given his violent temper, the defendant must have committed the battery. W.R.E. 404(a) goes on to provide, however, that there are circumstances in which evidence of a person's character may be admitted to prove that he acted in conformity therewith on a particular occasion. In the specific situations enumerated, character evidence is admissible in direct contravention of the general principle that character evidence is not admissible to prove conduct.

[¶ 17] The pattern of W.R.E. 404(b) is not the same. The general principle that character evidence may not be admitted to prove conduct remains intact in the first sentence. But "[e]vidence of other crimes, wrongs, or acts," which logically may or may not be character evidence, is admissible to prove things other than character. Consequently, the exceptions to the rule found in subsection (a) are not of the same nature as those found in subsection (b). The former allow evidence of character to prove conduct; the latter allow evidence of specific instances of conduct to prove "consequential facts" such as intent or knowledge. *Virgilio v. State,* 834 P.2d 1125, 1128 (Wyo.1992);

*Grabill v. State,* 621 P.2d 802, 808 (Wyo. 1980). Under neither subsection is evidence admissible if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes. *Daniel v. State,* 923 P.2d 728, 733 (Wyo.1996) (*quoting Dean v. State,* 865 P.2d 601, 606 (Wyo.1993), *abrogated and modified on other grounds by Vigil v. State,* 926 P.2d 351 (Wyo.1996)).

[¶ 18] Admissibility under W.R.E. 404(b) is not limited to the purposes set forth in the rule, and we have adopted a liberal approach toward admitting uncharged misconduct evidence. *Mitchell v. State,* 865 P.2d 591, 596 (Wyo.1993); *Bishop v. State,* 687 P.2d 242, 245 (Wyo.1984), *cert. denied,* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), *abrogated on other grounds by Vigil,* 926 P.2d at 356–57. The listed exceptions are illustrative rather than exclusive. *Gezzi v. State,* 780 P.2d 972, 974 (Wyo.1989). Nevertheless, because uncharged misconduct evidence carries an inherent danger for prejudice, we have also adopted a mandatory procedure for testing its admissibility: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *Vigil,* 926 P.2d at 357 (*quoting United States v. Herndon,* 982 F.2d 1411, 1414 (10th Cir.1992)). We do not apply this test on appeal; rather, it is intended to be conducted by the trial court.[2] *Beintema v. State,* 936 P.2d 1221, 1224 (Wyo.1997). Our role is to determine whether admission of the evidence was error. *Id.; Spencer v. State,* 925 P.2d 994, 997 (Wyo.1996). Generally, the standard for review of rulings under W.R.E. 404(b) is abuse of discretion. *Johnson v. State,* 936 P.2d 458, 462 (Wyo.1997) (*quoting Sturgis v. State,* 932 P.2d 199, 201 (Wyo.1997)). However, where no trial objection occurred, the plain error standard applies. *Beintema,* 936 P.2d at 1224; *Spencer,*

925 P.2d at 997. To prove plain error, an appellant must demonstrate that the record clearly shows an error that has transgressed a clear and unequivocal rule of law and has adversely affected a substantial right of the appellant. *Weidt v. State,* 2002 WY 74, ¶ 8, 46 P.3d 846, 851 (Wyo.2002).

[¶ 19] The trial court's determination that evidence of similar sexual misconduct is admissible in a child sexual abuse case to prove such purposes as motive and intent, where a defendant denies any wrongdoing, is certainly not unprecedented. *See, for example, Brower v. State,* 1 P.3d 1210, 1214 (Wyo. 2000) (in trial for indecent liberties with a minor, testimony of victim's sister as to similar misconduct by defendant with her admissible to prove motive); *Rigler v. State,* 941 P.2d 734, 738 (Wyo.1997) (in child sexual abuse case, evidence of similar previous misconduct with different victim admissible to prove *modus operandi,* preparation, plan, intent, and credibility of victim); *Daniel,* 923 P.2d at 734–35 (in prosecution for indecent liberties, testimony of six other children about sexual activities with defendant admissible to prove course of conduct); *Jackson v. State,* 891 P.2d 70, 75–76 (Wyo.1995) (victim's testimony of prior sexual acts by defendant step-father admissible in indecent liberties case as proof of motive, course of conduct, and credibility of victim); *Johnson v. State,* 872 P.2d 93, 95–98 (Wyo.1994) (in indecent liberties case, testimony of social worker that defendant had admitted previous sexual molestation of a ten-year-old girl admissible to prove motive, intent, and identity); *Mitchell,* 865 P.2d at 598–99 (in trial for second-degree sexual assault of a ten-year-old girl, defendant's admission of sexual arousal during prior sexual activity with a three-year-old niece, for which the defendant was convicted, admissible to prove motive); *Gezzi,* 780 P.2d at 977–78 (in prosecution for indecent liberties with daughter, testimony of older daughter as to similar misconduct with her admissible to prove defendant's motive and victim's credibility); *Brown v. State,* 736 P.2d 1110, 1113 (Wyo.1987) (in prosecution for incest, testimony by victim and her half-sister impli-

---

2. Recently, we modified the *Vigil* test to establish a firm preference for the ***pretrial*** determination of issues concerning uncharged misconduct evi-

dence. *Howard,* 2002 WY 40, ¶ 23, 42 P.3d at 491.

cating defendant in prior sexual abuse admissible because aberrant sexual behavior is probative of motive); and *Elliott v. State*, 600 P.2d 1044, 1048–49 (Wyo.1979) (in trial for second-degree sexual assault, testimony of victim's older sister as to similar misconduct by defendant with her admissible to prove motive based on pedophilia).[3] The evidence of uncharged misconduct alleged in the instant case is similar to that admitted in these many cases.

■ [¶ 20] With one exception, the uncharged misconduct evidence admitted in this case was subjected to an appropriate *Vigil* analysis. M.F.'s testimony, for instance, was substantially as it had been outlined in the State's notice of uncharged misconduct evidence and as it had been described during the first motion hearing. The trial court and counsel discussed and debated the testimony in the context of W.R.E. 404(b) and the *Vigil* test, and during the final hearing, the trial court made the necessary *Vigil* findings. Gleason has not shown an abuse of discretion by the trial court in admitting M.F.'s testimony. To the contrary, the record reflects the trial court's careful pretrial attention to this issue. The trial court's analysis included the consideration of prejudice required by W.R.E. 403 and *Vigil*. The trial court articulated a consistent and legitimate basis for its rulings, in which case we do not reverse. *Johnson*, 936 P.2d at 462 (*quoting Sturgis*, 932 P.2d at 201). And finally, the trial court gave an appropriate instruction, limiting the jury's consideration of the uncharged misconduct evidence to the proper purposes for which it had been offered.

■ [¶ 21] As with M.F.'s testimony, we find that A.F.'s testimony was substantially as it had been outlined in the State's notice of uncharged misconduct evidence and as it had been described during the first motion hearing. It was likewise discussed and debated by the trial court and counsel, and was subjected pretrial to W.R.E. 404(b) analysis under *Vigil*. Like M.F.'s testimony, A.F.'s testimony was relevant, it was introduced for proper purposes, especially proof of motive,

and the trial court determined it to be more probative than prejudicial. The trial court did not abuse its discretion in admitting A.F.'s testimony.

■ [¶ 22] Similarly, M.W.'s testimony was "as advertised." In fact, her testimony was more limited than had been approved in the trial court's pretrial rulings. The trial court reviewed the testimony as required by *Vigil*, and Gleason has not shown that he was prejudiced by its admission. We cannot find an abuse of discretion in the admission of M.W.'s testimony. Evidence of contemporaneous misconduct of a similar nature to that with the victim was relevant and probative of motive.

■ [¶ 23] While perhaps not as clear cut, because of the age difference of the victim and the time passed, the same can be said of the testimony of Mr. Sklut concerning Gleason's prior sexual abuse of his daughter in Delaware. Because the trial court subjected Mr. Sklut's evidence to the appropriate *Vigil* analysis, and because Wyoming case law establishes the admissibility of prior sexual misconduct with a child as evidence of proper W.R.E. 404(b) purposes, such as motive, we do not find that the trial court abused its discretion in admitting Mr. Sklut's testimony.

■ [¶ 24] Finally, Gleason contends that admission of Mrs. McIntyre's testimony about A.F.'s statements to her constituted plain error because (1) the record clearly shows that Mrs. McIntyre was not listed in the State's notice of uncharged misconduct evidence; (2) the failure to give Gleason notice of her testimony violated the trial court's pretrial order; and (3) Gleason was prejudiced by this contribution to the "extensive 404(b) evidence" that he feels denied his right to a fair trial on the merits. However, we do not find plain error. Mrs. McIntyre's testimony about A.F.'s statements was part of her description of how the charged crimes came to be reported. Mrs. McIntyre was listed in the State's pretrial memorandum as a witness for that purpose, so Gleason was

---

3. Consonant with the reasoning of these cases, three new rules—F.R.E. 413, 414, and 415—have been added to the Federal Rules of Evidence specifically authorizing the admissibility of similar crimes evidence in both civil and criminal sexual assault and child molestation cases.

not surprised by the testimony. Beyond that, her testimony was brief, and she did not reveal anything the jury did not learn from M.F. and A.F. Gleason has not shown that he was prejudiced.

[¶ 25] In summary, we conclude that the uncharged misconduct evidence admitted in this case was admitted for one or more proper purpose under W.R.E. 404(b), that the trial court performed the pretrial analysis required by *Vigil* to determine the relevance of the evidence, and that the trial court properly balanced the probative nature of the evidence against its potential for unfair prejudice. The trial court did not abuse its discretion in admitting the evidence.

[¶ 26] Despite the resolution of this issue, we feel compelled to address in more detail the difficulties encountered in the appellate review of the admission of uncharged misconduct evidence under W.R.E. 404(b). The primary step in propounding uncharged misconduct evidence is identification of a proper purpose for its admission. In that regard, we have previously held that the State need not pinpoint but one purpose for admission of such evidence. *Sturgis,* 932 P.2d at 203. Nevertheless, it is incumbent upon the proponent to identify such purpose or purposes with specificity because, without such specificity, the balance of the *Vigil* test cannot be applied. For evidence to be relevant, we must know the fact question to which it is relevant. For evidence to be probative, we must know what it is meant to prove.

[¶ 27] For proper appellate review of the admissibility of evidence under W.R.E. 404(b), the record must reflect that the trial court required the State not only to identify the proper purpose for which uncharged misconduct evidence is being offered, but also to explain how or why it is probative, and why it is more probative than prejudicial. In that regard, we have twice set out in a footnote the process that should be followed by the trial court in making that analysis. To make sure there is no doubt in the future that this is a required process, we will repeat it now, in the body of this opinion:

In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

Evidence is unfairly prejudicial if it tempts the jury to decide the case on an improper basis. In balancing against its probative value the unfair prejudice created by the evidence, the trial court should consider the extent to which the evidence distracts the jury from the central question whether the defendant committed the charged crime. The trial court should weigh these additional factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Rigler*, 941 P.2d at 737 n. 1 (*citing Dean*, 865 P.2d at 609–10 n. 2).[4]

[¶ 28] In *Rigler*, 941 P.2d at 737–38, we held that, so long as the record revealed that the trial court had subjected proposed uncharged misconduct evidence to the appropriate test of its probative value and prejudicial effect, the trial court need not make express findings on the record on each of these factors. Since that opinion was published, however, we have repeatedly been called upon to assess a trial court's exercise of discretion on such rulings, and we now remind the trial courts that, while express findings on **each** factor are not necessary, abuse of discretion, or the lack thereof, cannot be determined by reviewing a record that contains no information as to how that discretion was exercised.

[¶ 29] We have a well-established standard for analyzing claims for abuse of discretion:

We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion, we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo [v. State]*, 2 P.3d [567] at 571 [ (Wyo.2000) ].

*Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766 (Wyo.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002). In applying that standard, we cannot determine whether conclusions were drawn from objective criteria if we do not know what criteria were applied. We cannot determine

whether sound judgment was exercised under the circumstances if we do not know what circumstances were considered. We cannot determine whether the trial court acted arbitrarily or capriciously if we do not know what the trial court did in reaching its decision.

[¶ 30] In future cases involving the admissibility of evidence under W.R.E. 404(b), the record shall reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice. The "shotgun approach" of listing every conceivable purpose for admissibility, followed by a bald statement that probative value outweighs prejudicial effect will no longer be sufficient. While the trial court need not make an express finding on every factor from *Dean* and *Rigler*, the record must contain sufficient findings to support the trial court's conclusions. The burden, of course, will be upon the proponent of the evidence to supply the foundation for its admission.

[¶ 31] The question of what must be shown to prove relevancy is not now directly before this Court. Nevertheless, because we intend by this opinion to "tighten up" the procedures for the admission of uncharged misconduct evidence under W.R.E. 404(b), we will address the point. Often, for example, the prosecutor simply states that evidence of prior sexual misconduct is relevant to prove motive or intent, and the trial court simply agrees, with nothing in the record substantiating either the prosecutor's declaration or the trial court's conclusion. In *Brown*, 736 P.2d at 1111–14, and *Elliott*, 600 P.2d at 1047–48, we approved of this approach, largely on the ground of precedent in other states:

We note that in cases involving sexual assaults, such as incest, and statutory rape with family members as the victims, the courts in recent years have almost uniformly admitted such testimony.

---

4. While the five-part *"Dean* test" has been replaced by the four-part *"Vigil* test," the balancing

of probative value against prejudicial effect is still required.

*Elliott,* 600 P.2d at 1048. We made the further statement in *Elliott* that "[o]ne who is a paraphiliac, whose preference or addiction for unusual sexual practices occurs in the form of pedophilia, could well be recognized as having a motive to commit the acts complained of by the victim." *Id.* at 1049. Similarly, in *Brown,* 736 P.2d at 1113, we opined that "[i]f the accused had a predilection to deviant sexual practices with young female relatives, it would not be unreasonable for the trier of fact to determine that he had a motive to commit the acts complained of by the victim in this case."

[¶ 32] The question is whether the inference of such a motive is something that can be drawn by the jury, without some level of evidence that would suggest the inference is appropriate. An illustrative case may be helpful. In Arizona, the courts have recognized a special exception to the general rule of inadmissibility whereby prior acts involving "sexual aberration" are admissible to prove the defendant's propensity to commit a similar crime. *State v. Roscoe,* 184 Ariz. 484, 910 P.2d 635, 642, *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996). The admission of such evidence, however, requires sufficient foundation:

> The admissibility of the prior act depends initially upon its relevancy, which involves complicated questions of sexual deviancy in a sophisticated area of medical and scientific knowledge. [We are] not prepared to resolve such questions in the absence of such expert knowledge.

*State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061, 1065 (1977). In other words, it is not appropriate to draw an inference without adequate basis.[5] It would seem that this would apply to any inference, not just the inference of propensity.

[¶ 33] Not all inferences, needless to say, will require proof by expert testimony. The inference of identity that may follow from evidence of a signature crime, for instance, is something that can be drawn without expert

help. The point remains, however, that, for purposes of appellate review, the record should contain such information as was relied upon by the trial court in determining to allow the jury to draw an inference from the evidence admitted under W.R.E. 404(b).

## PROSECUTORIAL MISCONDUCT

[¶ 34] Gleason's contention is that the "prosecutor committed misconduct in closing argument, by arguing the 404(b) evidence, wrongfully allowed by the trial court, as reason to convict Mr. Gleason." While our holding that the questioned evidence was rightfully admitted would seem to make this issue moot, Gleason's argument must still be addressed because it raises not just the *fact* that the prosecutor brought up the uncharged misconduct evidence in closing, but the *manner* in which it was argued.

[¶ 35] Our standard of review for claims of prosecutorial misconduct in closing argument is well established:

> In reviewing a claim of prosecutorial misconduct in closing argument, the court looks at the entire record to determine whether the defendant's case was so prejudiced by the improper comments as to result in the denial of a fair trial. *Capshaw v. State,* 10 P.3d 560, 567 (Wyo.2000); *Metzger v. State,* 4 P.3d 901, 910 (Wyo. 2000). The challenged comments are judged in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial. *Helm v. State,* 1 P.3d 635, 639 (Wyo.2000).
>
> . . . When an objection is launched to a statement made in closing argument, we defer to the trial court's ruling in the absence of a clear or patent abuse of discretion. *Gayler v. State,* 957 P.2d 855, 860 (Wyo.1998). Even then, reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable ver-

---

5. A refined version of this concept appears in *State v. Varela,* 178 Ariz. 319, 873 P.2d 657, 661 (1993):

> When a prior sexual act is near in time and reasonably similar, the act speaks for itself and provides the basis for the exercise of a judge's

discretion in determining relevancy. However, with the passage of time or where the acts are dissimilar, the predictive value of the prior act diminishes and the need for the "expert medical testimony" of *Treadaway* applies.

dict. *Gayler,* at 860. *See also Metzger,* 4 P.3d at 910. . . .

[When the defendant did not object at trial], we review his claims by applying the plain error standard. *Lane v. State,* 12 P.3d 1057, 1064 (Wyo.2000). To demonstrate plain error, [the appellant] "must show that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Taylor v. State,* 2001 WY 13, ¶ 16, 17 P.3d 715, ¶ 16 (Wyo.2001). Reversal of a conviction on the basis of prosecutorial misconduct, which was not challenged in the trial court, is appropriate only when there is "a substantial risk of a miscarriage of justice." *Capshaw,* 10 P.3d at 567 (quoting *Dice v. State,* 825 P.2d 379, 384 (Wyo.1992)).

*Burton v. State,* 2002 WY 71, ¶¶ 11–13, 46 P.3d 309, 313–14 (Wyo.2002). There was no trial objection in the instant case, so plain error analysis is appropriate.

[¶ 36] Gleason objects to three separate passages from the prosecutor's closing argument, the first of which occurred toward the end of the primary argument when the prosecutor said the following:

Mr. Gleason admitted in a document—and you heard from the attorney from the state of Delaware, Mr. Sklut. He admitted to that on that document. He knew full well what it was. He was advised by an attorney. He had an attorney in that case. He knew what it was and he admitted to it. I contend to you that that is one thing that is important in this case.

[M.W.] came in. 13 years old at the time. Lived with Mr. Gleason at the time. She said what happened to her. That's a fact. It's an uncontested, uncontroverted fact in this case.

Why he did it, I don't know. But he did it and that's what the facts reveal.

So did he have a motive to do what he did when he did it there?

He certainly did. Because that's what he does.

[¶ 37] The second statement Gleason finds objectionable occurred during the rebuttal closing, when the prosecutor said,

"[t]he evidence clearly shows that he's admitted to having sex with one child." Finally, Gleason finds prosecutorial misconduct in this passage, also from the prosecutor's rebuttal closing:

Now, when you get back to the jury room you are going to look at the information, and you've looked at all the information with regard to—well, you haven't looked at it, but you will get it—with regard to the admission that Mr. Gleason signed that when the gentleman came out, the Delaware Attorneys General office that prosecuted him out there, and you will look at that. And that's an admission. Just as if he would have told you and I out on the street, yeah, I had sexual intercourse with my kid. Or I did this or I did that.

He knew what the ramifications were. He was advised by an attorney and he knew whether or not he had to go to court that day. He knew what kind of case he had against him. He knew all these things. And I contend when you look at that, you will know what motivated him to do the things that he did.

[¶ 38] Gleason contends on appeal that, although the prosecutor "threw out" the word "motive" during these portions of his argument, he made no attempt to explain how the Delaware incident or M.W.'s testimony were probative of motive to do the acts alleged in the instant case. Specifically, Gleason states that neither proof that he had sexual intercourse with his three-year-old daughter nor proof that he kissed a thirteen or fourteen-year-old girl and mentioned buying her a dildo, was proof that he had a motive to touch an eleven-year-old girl.

[¶ 39] We find this argument unpersuasive, especially under plain error analysis. To begin with, it is simply a restatement of Gleason's opposition to the trial court's admission of the evidence as proof of motive. Second, while the record is clear as to what was said during closing argument, we cannot say that the argument transgressed a clear and unequivocal rule of law. At most, the prosecutor's argument as to the proof of motive was ineffectual. Neither do we find that these rather unspecific and isolated comments, in the context of about

twenty transcript pages of the prosecutor's closing, in which he analyzed the elements of the crime and the evidence related to those elements, adversely affected Gleason's right to a fair trial. There was no substantial miscarriage of justice.[6]

[¶ 40] Finally, Gleason argues that, inasmuch as neither Gleason nor his Delaware public defender testified, it was "pure conjecture" for the prosecutor to argue that Gleason "knew all these things" when he entered his pleas in Delaware. Gleason characterizes the prosecutor's conduct as arguing facts not in evidence. We find, to the contrary, that the prosecutor was merely arguing a reasonable inference that the jury could make from the facts that were in evidence. During Mr. Sklut's testimony, some question arose as to whether Gleason understood the ramifications of the charges against him in Delaware, whether he had been advised by counsel in that regard, and whether he had signed the probation documents in jail or in the courtroom. Through cross-examination, defense counsel suggested that Gleason signed the documents containing the admissions only in order to get out of jail. The prosecutor's argument in closing that Gleason "knew all these things" was based on Mr. Sklut's testimony about the charges, Gleason's arraignment on the charges, the presence of Gleason's attorney at arraignment and later when the probation document was signed in the courtroom. The prosecutor's argument was not misconduct.

## INEFFECTIVE ASSISTANCE OF COUNSEL

[¶ 41] Gleason was represented by private counsel in the trial court. At his request, an assistant public defender was appointed to represent him on appeal. The latter attorney obtained a partial remand of the case for the purpose of allowing the trial court to hear Gleason's claim of ineffective

assistance of counsel. Gleason's specific allegation was that his lawyer erroneously had informed the trial court that Gleason did not wish to be present during final jury selection in chambers. Gleason contends that his absence during that portion of jury selection (the exercise of peremptory challenges) deprived him of statutory and constitutional rights, and that he was prejudiced because he was unable to instruct his attorney to challenge particular jurors.[7]

[¶ 42] The trial court heard Gleason's motion on March 21, 2001. Gleason's trial attorney testified about his pretrial and trial jury selection process, and he described how and when he reviewed that process with Gleason. Specifically, he testified that he twice told Gleason he could be present during the peremptory challenge process, but that Gleason declined the opportunity. The attorney also filed an affidavit to the same effect.

[¶ 43] Gleason also testified at the hearing. He contradicted his attorney's assertion that he declined the chance to go into chambers for final jury selection. His recollection of their conversation was that his lawyer told him to go outside and have a cigarette while the lawyer spoke to the judge and the prosecutor for a few minutes. Gleason testified further that, had he been present in chambers, he would have instructed his attorney to challenge two particular jurors—a man with whom he had been involved in a "road rage" incident and a woman who had given him the "evil eye" in the courtroom. Both ended up on the jury.

[¶ 44] We apply the following standard of review to claims of ineffective assistance of counsel:

When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the

---

6. At the same time, however, we caution proponents of uncharged misconduct evidence to be careful to limit their arguments to the proper purpose for which the evidence was admitted. Here, only because the prosecutor related the evidence to proof of motive, we do not find his additional statement—"[b]ecause that's what he does"—harmful error requiring reversal. Out of context, the additional statement would look suspiciously like using character to prove conduct.

7. The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee an accused the right to be present during critical stages of criminal proceedings. *Seeley v. State*, 959 P.2d 170, 177 (Wyo.1998). In addition, both Wyo. Const. art. 1, § 10 and Wyo. Stat. Ann. § 7–11–202 (LexisNexis 2001) provide an accused the right to defend in person.

circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance.... The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment....

Under the two-prong standard articulated in *Strickland [v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] and *Frias [v. State,* 722 P.2d 135, 145 (Wyo.1986) ], an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted.... In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of [the] case." *Lower v. State,* 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

*Jackson v. State,* 902 P.2d 1292, 1295 (Wyo. 1995).

 [¶ 45] The issue of ineffective assistance of counsel may be waived if it is not raised on direct appeal. But, where the issue was not raised below, the facts generally have not been sufficiently developed for resolution of the issue by this Court. Consequently, we have created a process whereby cases are remanded to the trial court for factual development and an initial decision. *See Calene v. State,* 846 P.2d 679, 683–84 (Wyo.1993). That is the process that has occurred in this case. After the remand hearing, the trial court issued an order reflecting its conclusion that counsel had not been ineffective. The gist of the findings in that order is that Gleason was well aware that final jury selection was to occur in chambers, that he was specifically so advised by

his attorney, and that he voluntarily absented himself.

 [¶ 46] It seems clear that, if things happened as trial counsel testified, he was not ineffective. Counsel's testimony detailed his office's fairly sophisticated pretrial jury evaluation process, a process that included input from Gleason and Gleason's family members. In addition, Gleason was present in court during voir dire and appeared to participate in that process. Gleason was present when the trial judge told counsel that peremptory challenges would be handled in chambers. And he was present in open court when the trial judge asked, "Anything further before we recess to chambers to finalize the jury that will hear this case?" An accused may waive his right to be present at a proceeding, but such waiver, to be effective, must be knowingly and voluntarily made. *Maupin v. State,* 694 P.2d 720, 722 (Wyo.1985). Under appropriate circumstances, the waiver may be obtained from defense counsel rather than from the defendant. *Campbell v. State,* 999 P.2d 649, 661–62 (Wyo.2000).

 [¶ 47] The remand hearing became what was, in effect, a credibility contest between Gleason and his former attorney. The trial court's findings and conclusions obviously came from its determination that the attorney was the more credible of the two. The evidence adduced during the hearing, as well as the facts set forth above, substantiates this determination. Furthermore, the colloquy between the trial judge and trial counsel at the outset of the peremptory challenge procedure corroborates this conclusion:

> THE COURT: Court is in session. We're in chambers with Counsel.
>
> [Defense Counsel], does the defendant not want to be here?
>
> [DEFENSE COUNSEL]: That is correct, Your Honor.
>
> THE COURT: All right. As long as he knows he can be here. I'm not excluding him. In fact, he's more than welcome to be here. Normally defendants are, but I guess he can be excluded.

[DEFENSE COUNSEL]: *I explained the option to him.*

(Emphasis added.)

[¶ 48] With or without the strong presumption that counsel rendered effective assistance, it is nigh on to inconceivable that counsel would have lied outright to the judge during this exchange. The record is devoid of any suggestion or reason for trial counsel having wanted to keep Gleason out of chambers while the final jury was chosen. To the contrary, the record reflects that counsel systematically included Gleason in the jury evaluation and selection process.

[¶ 49] We agree with the trial court's conclusion that Gleason voluntarily waived his right to be present in chambers during the peremptory challenge process and with its further conclusion that counsel was not ineffective in concurring with such waiver. The record shows that Gleason had ample opportunity to be present in chambers. Nevertheless, we remind the trial courts that an explicit waiver by the defendant, on the record, would do much to prevent this issue from arising on appeal.

## CONCLUSION

[¶ 50] Admission of the uncharged misconduct evidence in this case was not error, and the prosecutor did not commit misconduct by his references to that evidence in closing argument. Further, defense counsel was not ineffective in allowing Gleason to absent himself from the peremptory challenge portion of jury selection.

[¶ 51] Affirmed.