2006 WY 116

**Steven Chris SANCHEZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–145.

Supreme Court of Wyoming.

Sept. 20, 2006.

---

* Chief Justice at time of expedited conference.

Representing Appellant: Dion J. Custis, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] A jury found Steven C. Sanchez guilty of first degree felony murder and second degree murder for causing the death of a seventeen-month-old child. He appeals from his judgment and sentence alleging several errors. He claims the district court erred by: (1) denying his motion for a change of venue; (2) admitting evidence under the Wyoming Rules of Evidence 404(b) and 609; (3) permitting expert testimony; and (4) imposing time constraints on closing arguments. Mr. Sanchez also contends the verdict was not supported by sufficient evidence. We affirm.

* Chief Justice at time of oral argument.

## ISSUES

[¶ 2] The following issues are presented on appeal:

I. Did the district court err in denying Mr. Sanchez's motions for change of venue?

II. Did the district court abuse its discretion in admitting evidence under W.R.E. 404(b)?

III. Did the district court abuse its discretion in admitting evidence under W.R.E. 609?

IV. Did the district court abuse its discretion in placing a time restriction on closing arguments?

V. Did the district court abuse its discretion in admitting the expert testimony of Dr. Sirotnak?

VI. Was there sufficient evidence to support Mr. Sanchez's convictions of first degree felony murder and second degree murder?

## FACTS

[¶ 3] On July 7, 2003, Mr. Sanchez was babysitting his girlfriend's seventeen-month-old son, JZ. At approximately 3:10 p.m., the Evansville Police Department received a call indicating that JZ had been hit in the chest at Mr. Sanchez's trailer home. Upon arrival, Officer Joseph Vigneri approached Mr. Sanchez who was holding JZ in his arms. The child was covered in vomit and was not breathing. Believing that JZ was choking, Officer Vigneri attempted to resuscitate him. A few moments later, medical personnel arrived and resuscitation efforts were continued. Their efforts were unsuccessful and the child was taken to the Wyoming Medical Center in Casper.

[¶ 4] At the hospital, Dr. Mel Meyer was advised that JZ had been hit in the chest and was not breathing. Upon examination, Dr. Meyer determined JZ had two collapsed lungs, but no external injuries existed except for an injury to the left side of his head and a soft mass on the right side of his head. Dr.

Meyer called in a trauma surgeon who inserted tubes into JZ's chest to remove the air that had accumulated in his chest cavity. A neurosurgeon was also consulted due to the severity of JZ's head injury. A CAT scan was ordered.

[¶ 5] Upon review of the CAT scan, the neurosurgeon concluded that JZ suffered a massive blow to his head. Surgery was performed to alleviate the pressure mounting in JZ's head and damaging his brain. The surgery alleviated some pressure, but JZ's chance of survival remained quite poor due to the extensive brain damage that had already occurred.

[¶ 6] After the surgery, JZ was stabilized and flown to the Children's Hospital in Denver, Colorado. Despite being seen by several physicians, his condition worsened. JZ died the following day.

[¶ 7] An investigation ensued to determine the cause of JZ's injuries. Officer Vigneri learned from the physicians at the Casper hospital that JZ's condition was the result of massive trauma to his head. When asked about the incident during subsequent interviews with the police, Mr. Sanchez gave varying versions, but ultimately told officers that he ran through a door in the trailer home and somehow hit JZ with his knee and/or the door, "taking him out." Mr. Sanchez repeated this statement to the investigator for the Department of Family Services.

[¶ 8] Mr. Sanchez was taken to the police department for another interview. Mr. Sanchez eventually admitted to hitting JZ in the back of the head. He also admitted that he was angry for various reasons when he went through the door. Mr. Sanchez was arrested and charged with first degree felony murder, committed in the perpetration of the abuse of a child under the age of 16 years, in violation of Wyo. Stat. Ann. § 6–2–101, and second degree murder in violation of Wyo. Stat. Ann. § 6–2–104. A jury convicted Mr. Sanchez of both offenses. He was sentenced to life imprisonment without the possibility of parole. This appeal followed.

*Change of Venue*

[¶ 9] Prior to jury selection, Mr. Sanchez moved for a change of venue claiming he would be unable to receive a fair and impartial trial in Natrona County as a result of pretrial publicity. The motion was denied. Five days before jury selection, Mr. Sanchez filed a motion to reconsider his change of venue request. The motion was based upon the same allegations as the first, but emphasized that the continuing media coverage was increasing the likelihood of prejudice. This motion was also denied.

■ [¶ 10] Mr. Sanchez challenges the district court's decision to deny both of his motions. We review decisions on motions for a change of venue under our abuse of discretion standard. *Sides v. State,* 963 P.2d 227, 231 (Wyo.1998). "We will not interfere with a trial court's decision concerning venue unless it acted in a manner exceeding the bounds of reason under the circumstances." *Nixon v. State,* 994 P.2d 324, 327 (Wyo.1999). Mr. Sanchez bears the burden of showing prejudice so great that a fair trial cannot be obtained. *Id.* Mr. Sanchez must also show actual prejudice in the minds of the jurors. *Id.*

[¶ 11] Article 1, § 10 of the Wyoming Constitution grants the right to trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." "The legislative provision mirroring the constitution requires 'every criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law.' " *Nixon,* 994 P.2d at 327 (quoting Wyo. Stat. Ann. § 1–7–102(a) (LEXIS 1999)). "Trial proceedings are transferred to another county 'only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county.' " *Id.* (quoting W.R.Cr.P. 21(a)).

[¶ 12] Mr. Sanchez contends the district court abused its discretion by applying the wrong standard when it analyzed his request for a change of venue. Mr. Sanchez argues that although the court required him to show actual prejudice, the pretrial publicity in this

case was so inflammatory that prejudice may be presumed and a change of venue required as a matter of law pursuant to *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). He claims that the overwhelming publicity coupled with the connection of Mr. Sanchez's case to other homicides involving the use of methamphetamine supports a presumption of prejudice.[1] We disagree.

[¶ 13] Presumed prejudice is rarely invoked and only in extreme circumstances. *United States v. Abello–Silva*, 948 F.2d 1168, 1177 (10th Cir.1991). Because pretrial publicity in topical criminal cases is inevitable, a defendant's rights are impacted only when the publicity dictates the community's opinion as to guilt or innocence. *Estes*, 381 U.S. at 536, 85 S.Ct. at 1629. In rare cases, the community is so predisposed that prejudice can be presumed and venue must be transferred as a matter of law. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

[¶ 14] For example, in *Estes*, prejudice was presumed because the pretrial publicity amounted to eleven volumes of press clippings. *Estes*, 381 U.S. at 535, 85 S.Ct. at 1629. In *Rideau*, prejudice was presumed when the defendant's confession to the sheriff was filmed and televised on the local news, compromising due process. *Rideau*, 373 U.S. at 727, 83 S.Ct. at 1419. In *Sheppard*, five volumes of news clippings accumulated in a six month period. Newspapers published the names and addresses of potential jurors who were peppered with letters and telephone calls regarding the upcoming trial. Again, prejudice was presumed. *Sheppard*, 384 U.S. at 342–343, 86 S.Ct. at 1512.

[¶ 15] In contrast, the evidence of the pretrial publicity in this case consisted of one newspaper clipping and one segment from a local news broadcast. That evidence reflects mostly statements of fact gathered from public records. Although the media did report Mr. Sanchez's case, the adverse publicity did not permeate the community to such a degree that empanelling a fair jury would have been impossible.[2] *United States v. Affleck*, 776 F.2d 1451, 1454 (10th Cir. 1985). This is not a case where prejudice may be presumed.

[¶ 16] Alternatively, Mr. Sanchez contends that even if prejudice is not presumed, actual prejudice tainted his trial and the district court erred by denying his motions. To determine whether pretrial publicity requires a change of venue, we utilize a two-part test. *Duke v. State*, 2004 WY 120, ¶ 25, 99 P.3d 928, 940 (Wyo.2004). First, the nature and extent of the publicity must be considered. *Id.* Second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination. *Id.*

[¶ 17] In his motions, Mr. Sanchez contended that selecting an impartial jury in Natrona County would be impossible considering the small population and the amount of news coverage. However, the nature and extent of the pretrial publicity in this case was not unusual and jury selection did not prove to be difficult. Relatively few potential jurors stated they had seen or heard about the case in the media. Of those potential jurors, only one claimed to have formed an opinion based on the media coverage and was excused. Five of the initial twelve names drawn ultimately served on the jury.[3] The other seven jurors selected were individually polled about the media coverage and each indicated that even if they had seen or heard anything over the months preceding the trial, that coverage would have no impact on their ability to evaluate the evidence presented to them at trial. These indications are suffi-

---

1. There were no allegations of methamphetamine use in this case.

2. Neither of the exhibits provided by Mr. Sanchez with his motions for change of venue reflects the media reporting his case in conjunction with other homicides involving the use of methamphetamine.

3. Three of those initial twelve were excused for cause—not because of an inability to set aside information that had been seen or heard in the media, but because of preformed opinions due to the nature of the allegations and the characteristics of the victim.

cient to guard against juror bias and impartiality:

> Even where a juror may have formed or expressed an opinion as to the defendant's guilt from having read or heard news coverage, that juror may hear the case if the juror states, and the court is reasonably satisfied, that the juror can lay aside his opinion and render a verdict based only on the evidence presented in court. Wyo. Stat. Ann. § 7–11–106 (1997).

*Nixon,* 994 P.2d at 327 (quoting *Sides v. State,* 963 P.2d 227, 231 (Wyo.1998)).

[¶ 18]   The pretrial publicity in this case was not overwhelming. Detailed areas of inquiry were made by defense counsel during *voir dire.* Potential jurors with preformed opinions were excused while remaining jurors repeatedly affirmed they could be fair and impartial. Defense counsel passed the jury panel for cause indicating satisfaction that the potential jurors could render a fair and impartial verdict. *See, e.g., Collins v. State,* 589 P.2d 1283, 1289 (Wyo.1979). Also of significance is that defense counsel failed to renew the motion for a change of venue, after *voir dire,* despite an invitation by the district court to do so in the event difficulties arose in seating the venire. We find no abuse of discretion.

### *W.R.E. 404(b)*

[¶ 19]   Mr. Sanchez claims error from the district court's decision to admit evidence that he called JZ a "niglet" and used other derogatory terms while talking about African Americans. Mr. Sanchez contends that both the State and the trial court failed to follow the factors set forth in *Gleason v. State,* 2002 WY 161, 57 P.3d 332 (Wyo.2002), in determining whether this evidence was properly admissible under W.R.E. 404(b). He asserts that the remarks served no purpose in the case other than to inflame the jury.

[¶ 20]   Rulings on the admission of evidence are placed within the sound discretion of the trial court and, in order to successfully challenge these rulings on appeal, an appellant must show that the trial court committed a "clear abuse of discretion." *Billingsley v. State,* 2003 WY 61, ¶ 9, 69 P.3d 390, 395 (Wyo.2003). A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. *Id.,* ¶ 9, 69 P.3d at 395. The appellant bears the burden of showing an abuse of discretion. *Trujillo v. State,* 2 P.3d 567, 571 (Wyo.2000).

[¶ 21]   Mr. Sanchez questions whether the remarks are properly considered prior bad acts as contemplated by W.R.E. 404(b). Pursuant to W.R.E. 404(b), evidence of prior crimes or other wrongdoings may be admissible if used for certain purposes:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* Although the terms "other wrongs or acts" are not further defined by W.R.E. 404(b), possible interpretations of those terms are discussed in Wright & Graham, *Federal Practice and Procedure: Evidence.* The purpose of "wrongs" is to "bring within the rule any sort of conduct that is likely to reflect adversely on the person in the eyes of the jury even though it has not been forbidden by the positive law." Wright & Graham, *Federal Practice and Procedure: Evidence* § 5239, at 456. "Other acts" can be interpreted to include any conduct, good or bad, that tends to show the character of the person involved. *Id.* Based on these interpretations of the rule, statements made by Mr. Sanchez which tended to show his character could be considered as other wrongs or acts. An inquiry under 404(b) was therefore proper.

[¶ 22]   In considering whether to admit evidence of prior crimes or wrongdoings, a trial court must subject the proposed evidence to a certain level of analysis and must provide some details as to why it allowed the evidence to be admitted:

> In *Rigler,* 941 P.2d at 737–38, we held that, so long as the record revealed that

the trial court had subjected proposed uncharged misconduct evidence to the appropriate test of its probative value and prejudicial effect, the trial court need not make express findings .on the record on each of these factors. Since that opinion was published, however, we have repeatedly been called upon to assess a trial court's exercise of discretion on such rulings, and we now remind the trial courts that, while express findings on *each* factor are not necessary, abuse of discretion, or lack thereof, cannot be determined by reviewing a record that contains no information as to how that discretion was exercised.

. . .

In applying [an abuse of discretion] standard, we cannot determine whether conclusions were drawn from objective criteria if we do not know what criteria were applied. We cannot determine whether sound judgment was exercised under the circumstances if we do not know what circumstances were considered. We cannot determine whether the trial court acted arbitrarily or capriciously if we do not know what the trial court did in reaching its decision.

In future cases involving the admissibility of evidence under W.R.E. 404(b), the record shall reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice. The "shotgun approach" of listing every conceivable purpose for admissibility, followed by a bald statement that probative value outweighs prejudicial effect will no longer be sufficient. While the trial court need not make an express finding on every factor from *Dean* and *Rigler*, the record must contain sufficient findings to support the trial court's conclusions. The burden, of course, will be upon the proponent of the evidence to supply the foundation for its admission.

*Gleason*, ¶¶ 28–30, 57 P.3d at 343 (emphasis in original).

[¶ 23] Upon our review, we find the State and the trial court followed the requirements of *Gleason*. Prior to trial, the State advised the trial court and defense counsel of its intent to introduce evidence that Mr. Sanchez made numerous racial slurs regarding JZ and JZ's father and that he treated JZ differently than his biological children. The State indicated it would use the evidence to show course of conduct, motive, and intent to rebut· any claim of accident or mistake. The State contended that no other evidence was available to serve this same purpose. The State also claimed that the events involving the evidence were relatively recent because all occurred within the last twelve months. The State also contended that the evidence was not unfairly prejudicial because the other wrongdoings were not as reprehensible as the crimes with which Mr. Sanchez was presently charged.

[¶ 24] The trial court agreed with the State's analysis. In its decision letter, the court determined˙ that the evidence could properly be used to show motive and intent and that it was relevant to show the relationship between the victim and Mr. Sanchez. Citing *Longfellow v. State*, 803 P.2d 848, 854 (Wyo.1990), the trial court stated that such evidence would be helpful to explain what happened between Mr. Sanchez and JZ based upon the reasoning that "events do not occur in a vacuum." In determining that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice, the court discussed each of the *Gleason* factors and provided its findings concerning each factor. We find no error in the court's decision to allow the evidence under W.R.E. 404(b).

*W.R.E. 609*

[¶ 25] Mr. Sanchez claims the district court abused its discretion by allowing the State to use evidence of his two prior convictions for child abuse for the purposes of attacking his credibility as a witness pursuant to W.R.E. 609. He argues that this evidence was especially prejudicial in his case because he was much more obligated to testify because he and the victim were the only witnesses to the event. He also argues that

due to the remoteness in time of the convictions, the court should have excluded the evidence.

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion. We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. In the absence of an abuse of discretion, we will not disturb the trial court's determination. The burden is on the defendant to establish such abuse.

*Wilks v. State*, 2002 WY 100, ¶ 19, 49 P.3d 975, 984 (Wyo.2002) (internal citations and quotation marks omitted).

[¶ 26] W.R.E. 609 provides in pertinent part:

> Rule 609.  Impeachment by evidence of conviction of crime.
>
> (a) *General rule.*—For the purpose of attacking the credibility of a witness,
>
> > (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one (1) year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused;
>
> > . . .
>
> (b) *Time Limit.*—Evidence of a conviction under this rule is not admissible if a period of more than ten (10) years has elapsed since the date of the conviction or of the release of the witness from the

confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.  However, evidence of a conviction more than ten (10) years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

[¶ 27] In this case, the trial court ruled that Mr. Sanchez's prior convictions would be admissible under W.R.E. 609 if Mr. Sanchez chose to testify.  Mr. Sanchez does not dispute that the convictions fell within the timeframe permitted by W.R.E. 609.  Rather, he contends that because his prior convictions barely fit within the ten-year period, the potential for unfair prejudice was great and the trial court should not have admitted the evidence in light of W.R.E. 403.  Our focus, therefore, is limited to whether the district court abused its discretion when it concluded the evidence was not unfairly prejudicial to Mr. Sanchez.

[¶ 28] "[T]he balancing of prejudice against probative worth is ordinarily a discretionary matter for the trial court ..." *Miller v. State*, 784 P.2d 209, 211 (Wyo.1989).  As a threshold matter, it is Mr. Sanchez who must "clearly demonstrate the inflammatory nature of the evidence and establish that it had little probative value." *Id.* Mr. Sanchez has failed to carry this burden.

[¶ 29] Mr. Sanchez testified on his own behalf.  His version of the events differed significantly from the physical evidence presented at trial and the testimony elicited from expert witnesses.  The evidence of his conviction was used to impeach Mr. Sanchez's credibility pursuant to W.R.E. 609.  An appropriate limiting instruction was given to the jury. *See Mazurek v. State*, 10 P.3d 531, 539 (Wyo.2000) (holding that "[g]enerally, the trial court should instruct the jury that evidence of a witness' conviction may be used only for the limited purpose of impeach-

ment and not as substantive evidence of guilt"). We find no abuse of discretion.

### Time Limit on Closing Arguments

▮ [¶ 30] Mr. Sanchez claims that he was denied his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 6 and 10 of the Wyoming Constitution because the trial court imposed a time restriction on closing arguments. Mr. Sanchez argues that the forty-five minutes allotted for his closing was an insufficient amount of time to summarize the evidence because of the number of witnesses and the variance in the criminal charges. This insufficient time, he claims, deprived him of effective assistance of counsel.

▮ [¶ 31] A trial court's decision to place time restrictions on closing arguments is reviewed under an abuse of discretion standard. *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2554, 45 L.Ed.2d 593 (1975); *Cole v. Tansy,* 926 F.2d 955, 958 (10th Cir.1991). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily and capriciously." *Penner v. State,* 2003 WY 143, ¶ 7, 78 P.3d 1045, 1047 (Wyo.2003).

[¶ 32] The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

▮ [¶ 33] Notwithstanding those rights, however, trial courts are afforded discretion in controlling their courtrooms and the proceedings therein, including closing arguments:

... In a criminal trial, which is in the end basically a fact[-]finding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. **The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations.** He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion.

*Herring,* 422 U.S. at 862, 95 S.Ct. at 2554 (emphasis added).

[¶ 34] Many courts have failed to find an abuse of discretion or a Sixth Amendment violation despite a time restriction on closing arguments. For example, in *United States v. Rogers,* 960 F.2d 1501, 1513 (10th Cir.1992), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 817, 121 L.Ed.2d 689 (1992), the court upheld a time restriction of forty-five to fifty minutes where the defendant was tried on twenty-six counts of violating various federal laws. The Court of Appeals for the Fifth Circuit upheld a restriction of ten minutes for each defendant in a case which covered a six-year period and involved multiple conspiracies, 40 witnesses, 133 exhibits, a 12 count indictment, and 22 pages of jury instructions. *United States v. Sotelo,* 97 F.3d 782, 793 (5th Cir.1996), *cert. denied,* 519 U.S. 1135, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997); 520 U.S. 1149, 117 S.Ct. 1324, 137 L.Ed.2d 486 (1997). Similarly, the Tenth Circuit affirmed the decision of the trial court to limit closing arguments to thirty minutes where the government's case involved twelve witnesses and twenty-seven exhibits. *United States v. Davila,* 693 F.2d 1006, 1008 (10th Cir.1982).

[¶ 35] In light of these decisions and under the circumstances of this case, forty-five minutes for summation is not unreasonable. Mr. Sanchez's trial lasted approximately

eight days—two of which were expended on jury selection and the unavailability of a witness. Sixteen witnesses were called. Defense counsel did not use all of the allotted time and did not lodge an objection as to what, if anything, he was unable to cover in his summation. Based on the foregoing, we find no abuse of discretion.

### Admission of Dr. Sirotnak's Testimony

[¶ 36] After several physicians had testified concerning JZ's injuries, the State called pediatrician Andrew Sirotnak, M.D., as a witness. Dr. Sirotnak testified about his qualifications and experience as an associate professor of pediatrics for the University of Colorado School of Medicine and as the director of the child protection team at the Denver Children's Hospital. He explained that the child protection team treats and evaluates child patients and consults other departments treating children who are suspected victims of abuse. Upon request from the State, the district court qualified Dr. Sirotnak as an expert without objection.

[¶ 37] Dr. Sirotnak testified that his team received a referral when JZ was being transferred to Children's Hospital, and they evaluated JZ's case. Dr. Sirotnak examined JZ, reviewed medical records, and consulted with JZ's mother. Dr. Sirotnak expressed the opinion that JZ's death was not the result of an accident.

[¶ 38] Mr. Sanchez claims the district court erred by admitting Dr. Sirotnak's testimony. First, he claims that permitting Dr. Sirotnak to provide cumulative testimony was an abuse of discretion. Second, he claims Dr. Sirotnak improperly invaded the province of the jury by providing a legal conclusion regarding an element of the crime, i.e., that JZ died as a result of child abuse. Finally, he claims Dr. Sirotnak impermissibly opined as to the credibility of Mr. Sanchez.

### A. Cumulative Testimony

[¶ 39] As Dr. Sirotnak was explaining the basis of his opinion, defense counsel objected that the testimony was cumulative because the jury had "already heard from other physicians, and he's not providing us anything

we haven't heard. . . ." In response, the State explained that Dr. Sirotnak had a different specialty and had seen JZ after he was transferred. The district court overruled the objection, noting Dr. Sirotnak's sub-specialty and his discussion of JZ's entire history, while other physicians had testified regarding JZ's condition at specific points in time.

[¶ 40] "Rulings on the admissibility of evidence are committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion." *Curl v. State*, 898 P.2d 369, 373 (Wyo.1995). Mr. Sanchez does not identify any prejudicial abuse by the district court in exercising its discretion to allow the testimony. Accordingly, we find no error.

### B. Element of the Crime

[¶ 41] Next, Mr. Sanchez challenges Dr. Sirotnak's testimony because he used the phrase "child abuse" throughout his testimony. He claims that whether child abuse occurred was a "legal conclusion which should be left for the jury to decide." Mr. Sanchez claims that "there is no way a doctor can tell if this was child abuse or not" and, therefore, Dr. Sirotnak should not have been allowed to give his opinion. Mr. Sanchez did not object to this aspect of the testimony at trial.

> We review evidence to which the defense does not object [to] at trial using the three-part test of the plain error standard. First, the record must be clear as to the incident which is alleged as error. Next, the party claiming error must demonstrate that a clear and unequivocal rule of law was violated. Finally, it must be proved that a substantial right has been denied, resulting in material prejudice. Unless admission of the evidence achieves the status of plain error, reversal is not warranted.

*Trujillo v. State*, 953 P.2d 1182, 1186 (Wyo. 1998).

[¶ 42] We first note that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the

trier of fact." W.R.E. 704. We have held that

> the jury can reject testimony that speaks directly to ultimate issues, and there is no reason to think that testimony of this sort is especially likely to overwhelm a jury or persuade it to give up its independence. Concerns that a jury would give up its responsibility to look critically at testimony and just take the word of the witness are overstated since juries have the power and authority to reject even decisive and informed testimony, and are told as much before they retire to deliberate.

*Hannon v. State*, 2004 WY 8, ¶ 87, 84 P.3d 320, 353 (Wyo.2004) (internal citation and quotation marks omitted).

[¶ 43] Prejudice does not automatically occur when a term or phrase is used in a question or argument that may have a meaning other than its legal meaning. *Armstrong v. State*, 826 P.2d 1106, 1113 (Wyo. 1992). When a term or phrase is not used in its strict legal sense, it may be allowed. *Id.* Dr. Sirotnak was qualified as a child abuse expert by the trial court. As demonstrated by the following testimony, Dr. Sirotnak used the phrase "child abuse" to explain JZ's medical diagnosis. The following excerpts from his testimony illustrate how he used the phrase:

> [PROSECUTION] ... Do you have any background or experience in diagnosing or treating victims of child abuse?
> [DR. SIROTNAK] Yes. That's the majority of my clinical work at the hospital.
> * * *
> [PROSECUTION] What ... items do you use to rely on to determine whether a person is a victim of child abuse or not?
> [DR. SIROTNAK] Well, in addition to, just like any medical diagnosis, sexual abuse, sexual assault, rape, physical abuse, physical assault, those are all medical diagnoses as well. So we start with the history. Why are you here today, or why are you referred to us to talk with you to help you. And the physical exam; referring records; records, again, if a child is being admitted may have hospital transfer records; radiology studies frequently have been done; laboratory studies may have been done;

and other medical provider's notes of medical care that has already occurred sometimes when they're coming into our institution.
> * * *
> [PROSECUTION] ... After reviewing all of this ... were you satisfied that [JZ] did not die of natural causes?
> [DR. SIROTNAK] It's clear that this was not a natural death.
> [PROSECUTION] Okay. By that, what do you mean?
> [DR. SIROTNAK] This is a death that occurred in a non[-]accidental—as a result of trauma to his head and very clearly in a non[-]accidental manner. ·
> * * *
> [PROSECUTION] And based on your review of all of the medical records, relying on your extensive training and experience in the field of child abuse and also in pediatric medicine, did you make a medical diagnosis regarding the cause of death for [JZ]?
> [DR. SIROTNAK] Yes.
> [PROSECUTION] And what was that?
> [DR. SIROTNAK] This is a case of child abuse. It's a case of fatal, physical abuse of [a] child.
> [PROSECUTION] Now, Doctor, all the opinions that you have rendered today, are they based on your education, training, and experience in the field of pediatric medicine and child abuse?
> [DR. SIROTNAK] Yes.
> [PROSECUTION] And are they generally accepted in the medical community?
> [DR. SIROTNAK] In terms of how to make a diagnosis?
> ... Yes.

[¶ 44] In contrast, "child abuse," in its legal sense is made up of the following elements:

> (i) The actor is an adult or is at least six (6) years older than the victim; and

> (ii) The actor intentionally or recklessly inflicts upon a child under the age of sixteen (16) years:

(A) Physical injury as defined in W.S. 14–3–202(a)(ii)(B); or

(B) Mental injury as defined in W.S. 14–3–202(a)(ii)(A).

Wyo. Stat. Ann. § 6–2–503(a) (LexisNexis 2005). The jury's role was to determine whether those elements were met. While the phrase "child abuse" has a legal meaning, it also has meaning in the medical context. Against that backdrop, we find no error in the expert's use of the phrase "child abuse."

### C. Opinion as to Mr. Sanchez's Credibility

[¶ 45] Mr. Sanchez next asserts that Dr. Sirotnak impermissibly testified regarding Mr. Sanchez's credibility. Specifically, he claims it was improper for Dr. Sirotnak to comment upon Mr. Sanchez's version of events being inconsistent with the doctor's opinion of the cause of death. Mr. Sanchez did not raise an objection to the district court, thus limiting our review to a search for plain error. *Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998).

[¶ 46] Dr. Sirotnak testified that the various versions of the incident leading to JZ's death, provided by Mr. Sanchez, were inconsistent with the injuries JZ sustained:

> [DR. SIROTNAK] . . . This injury of did his knee hit his chest? [D]id his knee or the door hit his chest? [W]as it just the door? Was it the knee and the door and the tricycle? [W]as it the door and the tricycle, it just evolves. None of it makes clinical sense that the severity of the head bump from that kind of fall from a standing height, whether or not he was pushed forward by a knee or a door or both, it does not explain the severity of this child's massive left-sided injury.

[¶ 47] The credibility of witnesses and the guilt of the accused are questions for the jury to resolve. *Gayler*, 957 P.2d at 860.

> A witness, lay or expert, is not permitted to articulate an opinion as to the guilt of the accused under W.R.E. 704. *Stephens v. State*, 774 P.2d 60 (Wyo.1989). The obvious reason is that opinion testimony about guilt or innocence does not address

areas that assist the jury in resolving factual issues. *Bennett v. State*, 794 P.2d 879 (Wyo.1990).

*Armstrong*, 826 P.2d at 1111. *See also McCone v. State*, 866 P.2d 740, 751 (Wyo. 1993) (no witness should be permitted to testify that another witness is or is not telling the truth).

[¶ 48] "However, testimony assisting the jury 'in understanding some aspect of the testimony of another witness that does not comment **directly** on that witness' credibility or veracity, is not invasive of the role of the jury.' " *Seward v. State*, 2003 WY 116, ¶ 19, 76 P.3d 805, 814 (Wyo.2003) (emphasis added) (quoting *Saldana v. State*, 846 P.2d 604, 618 (Wyo.1993)); *Curl*, 898 P.2d at 374 (stating "[a]lthough that testimony might have had the collateral or incidental effect of supporting VD's credibility, it was not a direct comment on his credibility or veracity and cannot be said to constitute error").

[¶ 49] Although Dr. Sirotnak discussed the implausibility of the explanations for JZ's injury given by Mr. Sanchez, Dr. Sirotnak did not comment directly on Mr. Sanchez's veracity or his credibility. He was explaining his opinion that JZ's injuries were not consistent with an accident. We find no error.

### Sufficiency of the Evidence

[¶ 50] Mr. Sanchez claims that insufficient evidence exists to support his conviction for first degree felony murder and second degree murder, and therefore, the convictions must be reversed. Although difficult to glean from his brief, Mr. Sanchez appears to contend that it is impossible to find that he acted recklessly and, at the same time, acted purposely and maliciously. Because he concludes that the two states of mind are mutually exclusive, he contends the State could not have proven both crimes.

[¶ 51] Mr. Sanchez's argument has no merit. We have held that intentional conduct encompasses reckless conduct. *See Simmons v. State*, 2003 WY 84, ¶ 30, 72 P.3d 803, 814 (Wyo.2003) (holding that "if the evidence supports a finding that a reasonable jury could conclude [the appellant] intention-

ally inflicted physical injury upon [the child], recklessness is established"). The verdict form indicates the jury found Mr. Sanchez guilty of second degree murder which requires that he acted purposefully and maliciously. It follows necessarily that Mr. Sanchez also acted recklessly. "[I]f the crime can be committed recklessly, it is no less committed if the actor acted purposely." *Simmons*, ¶ 30, 72 P.3d at 813–814. In addition, the two crimes were properly merged for sentencing. We find no error.

## CONCLUSION

[¶ 52] For the foregoing reasons, we affirm the Judgment and Sentence entered by the district court.